## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BADLANDS ENERGY, INC. | ) | Case No. 17-17465 KHT |
| EIN: 98-0204105, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | |
| | ) | Case No.  17-17467 KHT |
| BADLANDS PRODUCTION COMPANY | ) | Chapter 11 |
| EIN: 84-1461816, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | |
| | ) | Case No.  17-17469 KHT |
| BADLANDS ENERGY-UTAH, LLC | ) | Chapter 11 |
| EIN: 47-2023934, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | |
| | ) | Case No.  17-17471 KHT |
| MYTON OILFIELD RENTALS, LLC | ) | Chapter 11 |
| EIN: 20-1202389, | ) | |
| | ) | **Jointly Administered Under** |
| Debtor. | ) | **Case No.** 17-17465 KHT |
| | ) | |

| | | |
|---|---|---|
| WAPITI OIL & GAS II, LLLC | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| BADLANDS PRODUCTION COMPANY AND | ) | |
| GARRISON LOAN AGENCY SERVICES, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## ORIGINAL COMPLAINT

Wapiti Oil & Gas II, LLC ("Plaintiff" or "WOG II")[1] hereby files this *Original Complaint* (the "Complaint") against Badlands Production Company[2] ("BPC") and Garrison Loan Agency Services, LLC ("Garrison", and together with BPC, the "Defendants") in its capacity as administrative agent for certain lenders (the "Prepetition Lenders") under that certain amended and restated credit agreement dated August 19, 2014 (the "Amended and Restated Prepetition Credit Agreement").

## I.
## SUMMARY OF RELIEF REQUESTED

Garrison asserts it has a first priority lien. WOG II has contractual liens pursuant to a joint operating agreement and contract operating agreement filed prior to Garrison's lien. The proposed DIP order requires an adversary be filed within 75 days to challenge the priority of Garrison's lien.

WOG II is filing this adversary to declare the validity, priority, and amount of its liens and security interests.  In connection with this issue, whether WOG II properly terminated the Contract Operating Agreement (as defined below) needs to be addressed to determine proper credits and deductions for COPAS overhead.

Additionally, this Court previously found that production proceeds related to WOG II's working interests are not property of the estate.  However, WOG II seeks a declaration that BPC improperly netted certain amounts against WOG II's proportionate share of production, and that such amounts are therefore not property of the estate.

---

[1] The stalking horse bidder, Wapiti Newco, LLC ("Newco" or the "Stalking Horse Bidder"), is not an affiliate of WOG II, although they do have some common ownership.  Newco is represented by separate counsel.
[2] The contracts giving rise to the claims in this lawsuit were signed in March 2012 by Gasco Production Company, which has since changed its name to Badlands Production Company.

## II.
## INTRODUCTION

1.      BPC is the contract operator of certain oil and gas assets in the Uinta Basin in which WOG II owns non-operating working interests.[3]

2.      BPC breached the Contract Operating Agreement (as defined below) by, among other things, overcharging WOG II for various expenses and charges and underpaying WOG II for its proportionate share of the production proceeds.

3.      On September 6, 2016, WOG II filed a complaint in Harris County, Texas (the "State Court Complaint") seeking damages and other relief in relation to BPC's breach.  The State Court Complaint has been stayed.

4.      In the Contract Operating Agreement (as defined below) and the Joint Operating Agreement (as defined below), BPC granted WOG II liens and security interests on its real and personal property in the Contract Area (as defined in the Contract Operating Agreement) to secure the obligations BPC owes to WOG II under the Contract Operating Agreement.  WOG II properly perfected such liens and security interests by recording a memorandum of the Contract Operating Agreement and Joint Operating Agreement in the real property records of the applicable counties on May 21-23, 2012 and by recording UCC financing statements with the secretary of state of Delaware on June 26, 2013.

5.      *After* WOG II perfected its liens and security interests, on October 18, 2013, BPC, at the time called Gasco Production Company, borrowed money from Orogen Energy, Inc. ("Orogen").  Orogen subsequently assigned its interest in the loan to Garrison and the Prepetition Lenders.

---

[3] WOG II is the operator of record, but entered into a contract operating agreement with BPC.

6.      Subsequently, on August 11, 2017 (the "Petition Date"), BPC, Badlands Energy, Inc. ("BEI"), Badlands Energy Utah ("BEU"), and Myton Oilfield Rentals, LLC ("Myton," and together with BPC, BEI, and BEU, the "Debtors") filed petitions for relief under chapter 11 of the Bankruptcy Code.

7.      As part of the bankruptcy process, the Debtors sought DIP financing from Garrison as DIP Agent and certain of its affiliates comprising the Prepetition Lenders.  Despite the fact that WOG II properly perfected its liens and security interests prior to Garrison or Garrison's predecessor in interest, Garrison asserts that it has a first priority lien upon the Debtors' assets.  Furthermore, despite a Court order that the production proceeds attributable to WOG II's working interests are not property of the estate, BPC improperly netted certain charges against such proceeds and is holding the proceeds as property of the estate. Under the Interim DIP Order (as defined below), WOG II and other parties in interest have 75 days from the Petition Date to challenge Garrison's liens and priority, or else be forever barred from doing so.

8.      Accordingly, WOG II files this Complaint in order to, among other things, (i) obtain a declaratory judgment that (a) the Debtors improperly netted certain amounts against WOG II's rightful share of production proceeds, and such amounts are therefore not property of the debtor's bankruptcy estate, (b) WOG II has perfected liens that are senior in priority to those of Garrison, and the amount of such liens (c) the Contract Operating Agreement was properly terminated prior to the Petition Date; and (ii) liquidate the amount of damages related to the breach of contract and other related causes of action.[4]

---

[4] WOG II will not seek to collect any judgment for damages without further seeking to lift or modify the automatic stay.

## III.
## PARTIES

9.      Plaintiff Wapiti Oil & Gas II, LLC is a Delaware limited liability company with its principal place of business at 800 Gessner Road, Suite 700, Houston, Texas 77024.

10.     Defendant Badlands Production Company is a Delaware corporation with its principal place of business at 7979 E. Tufts Avenue, Suite 1150, Denver, Colorado 80237. Defendant Badlands Production Company may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

11.     Defendant Garrison Loan Agency Services, LLC is a Delaware limited liability company with its principal place of business at 1290 Avenue of the Americas, Suite 914, New York, New York 10104.  Defendant Garrison Loan Agency Services, LLC may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

## IV.
## JURISDICTION AND VENUE

12.     On September 14, 2017, the Court entered an order approving the DIP financing on a final basis [Dkt. No. 136] (the "Final DIP Order").  Pursuant to the Final DIP Order, "the automatic stay provided in Bankruptcy Code § 362 shall not apply to any adversary proceeding commenced in this Court by any party in interest to determine the extent, validity, or priority of any purported lien or interest in property (together with any contract or accounting issues related to such action that may be subject to entry of final orders and judgments in this Court), provided however, that any party in interest shall not collect any final judgment nor foreclose any lien

granted by a final order or judgment without further relief or modification of the automatic stay."[5]

13.    This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1331, 1334, and 157(b).  This is a core proceeding under 28 U.S.C. § 157(b)(2).

14.    Venue is proper under 28 U.S.C. § 1409.

## V.
## BACKGROUND AND FACTS

### A.    The Purchase Agreement and Development Agreement

15.    In March 2012, BPC—then known as Gasco Production Company—and WOG II entered into that certain purchase agreement dated March 22, 2012 (the "Purchase Agreement"), in which BPC sold to WOG II an undivided 50% interest in certain of BPC's Uinta Basin producing oil and gas assets.

16.    Concurrently, BPC sold to WOG II an undivided 50% interest in BPC's Uinta Basin non-producing oil and gas assets pursuant to that certain development agreement between Gasco Production Company and WOG II, dated March 22, 2012 (the "Development Agreement"). The Development Agreement committed WOG II to fund $33.75 million of the drilling and completion costs associated with the exploration and development of the non-producing assets (*i.e.* the "Drilling Commitment"). The parties' respective rights and obligations associated with the commitment to drill was set out in a drilling program to develop the non-producing properties (the "Drilling Program").

### B.    The Joint Operating Agreement and Contract Operating Agreement

17.    At the same time, the parties also entered into (i) joint operating agreements (naming BPC as the operator for one contract area and naming WOG II as the operator for a

---

[5] Final DIP Order at ¶ 12.

different contract area), including that certain A.A.P.L. Model Form 1989 joint operating agreement dated March 22, 2012 (the "Joint Operating Agreement" or "JOA"); and (ii) that certain contract operating agreement dated March 22, 2012 (the "Contract Operating Agreement" or "COA"). Under the COA, WOG II appointed BPC as the contract operator under its Joint Operating Agreement to carry out the day-to-day operations and conduct the Drilling Program outlined in the Development Agreement until the Drilling Commitment was fulfilled.

18.    As contract operator, BPC agreed to carry out certain Operator Services for the benefit of WOG II including, but not limited to: (a) issuing Joint Interest Billings ("JIBs"); (b) Accounts Payable Processing; and (c) Revenue Accounting. *See* COA § 3.1(a)–(c). These services require proper and accurate billing for costs and expenses related to third-party contracts. *See id.* ¶ 4.5.

19.    BPC currently collects 100% of the revenues from the Properties, and it is required to remit to WOG II its share of those revenues net of certain permissible deductions (the "Production Proceeds"). BPC is also obligated to pay amounts owed under contracts with all third-parties, including Monarch Natural Gas, LLC ("Monarch"), which is the owner and operator of the gathering system used in the Contract Area, and not default on those obligations (the "Third Party Payments"). In turn, BPC must submit accurate and timely JIBs to WOG II, and bill WOG II for reimbursement of its appropriate share of expenses to BPC. BPC holds any amounts paid by WOG II to cover its proportionate share of expenses for WOG II's benefit (the "Expense Funds", and together with the Production Proceeds, the "Working Interest Funds"). Pursuant to the JOA, the Production Proceeds and Expense Funds "remain the funds" of WOG II

"until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B."[6]

20.     Under the COA, BPC agreed that it shall carry out its duties as operator in accordance with the standard of care of a reasonably prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable laws and regulations. *Id.* § 4.1.

### C.     The Monarch Gathering Agreement

21.     All of the producing and non-producing assets are served by one gathering system, owned and operated by Monarch, a company that is unaffiliated with WOG II or BPC. Prior to the Purchase Agreement, BPC had entered into a gas gathering and processing agreement with Monarch (the "Monarch Agreement"). After WOG II and BPC entered into the Purchase Agreement and the Development Agreement, both WOG II and BPC novated the Monarch Agreement to separate WOG II's rights from BPC's rights to use the gathering system. WOG II, BPC, and Monarch executed the novation agreement to evidence WOG II's direct contractual relationship with Monarch and to evidence the division of the contractual rights and obligations among the parties.

### D.     The Closing Agreement

22.     Additionally, in that certain closing agreement related to WOG II's purchase dated March 22, 2012 (the "Closing Agreement"), BPC retained all obligations (and agreed to hold WOG II harmless from such obligations) under the Monarch Agreement relating to any failure of BPC or WOG II to deliver Quarterly Minimum Volumes of gas (as defined in the Monarch Agreement) during the period beginning March 1, 2015 and ending on March 1, 2017.

---

[6] Joint Operating Agreement at V(D)(4).

E.      **BPC's Failure to Comply with its Obligations**

23.      Breach of Drilling Commitment.   In 2014, the parties drilled and completed 9 wells under the Development Agreement. In early 2015, WOG II and BPC agreed to cease drilling operations for 6 months, and to assess whether the completion methods utilized for the 9 previous wells increased expected ultimate recoveries. Since the end of those 6 months, however, BPC has wrongly prevented further drilling and, as a result, has not allowed WOG II to complete the Drilling Commitment. BPC has no valid basis for its conduct; indeed, BPC has conceded that its actions are motivated solely by the drop in energy prices and BPC's statement that it does not believe continued drilling and development is economically viable. Such motivations do not excuse BPC's contractual obligations. BPC's conduct has prevented WOG II from completing the final 3 wells under the Drilling Program and replacing BPC as contract operator under WOG II's JOA, and has wrongly prevented WOG II from earning profits, rights and interests under the Development Agreement.

24.      Failure to Submit Timely and Accurate JIBs.   In addition, BPC has failed to submit timely and accurate JIBs to WOG II. BPC repeatedly has failed to submit JIBs within the 30 days as required under COPAS; instead, BPC has delayed submission of JIBs up to 60 or even 90 days. Late billing by BPC has prevented WOG II from obtaining timely knowledge of expenses incurred by BPC and has harmed WOG II. BPC has also wrongly attempted, as the result of its own improper and erroneous billing practices, to claim that WOG II is in default of its payment obligations to BPC.

25.      Improper Production Differential Charges.      The parties agreed in the Development Agreement to certain marketing costs for their production. Specifically, they agreed that BPC would contract in writing with Piceance Gas, Inc. ("Piceance") to market the production from the properties in which they were undivided interest owners. *See* Development

Agreement § 3.5(b). WOG II agreed to reimburse BPC for half of the <u>actual</u> third-party marketing fees and expenses paid to Piceance, and BPC agreed to provide WOG II with a written contract between BPC and Piceance immediately after closing. WOG II and BPC also agreed to share 50/50 the fees collected from other undivided interest owners. The parties further agreed that if BPC and Piceance terminated their marketing relationship for any reason, then the parties would mutually agree on a replacement marketer or mutually agree to cancel their marketing relationship altogether. *Id.*

26.     BPC did not do this, but instead arbitrarily decided to charge 8 cents per MCF rather than 1/2 of Piceance's <u>actual</u> marketing fees. WOG II objected and did <u>not</u> agree to this charge.  This resulted in overbilling of at least $760,197, and BPC continues to do this.  The calculation of overcharges from 2012 through the first 545,202 MCF produced in 2017 is attached as **<u>Schedule A</u>**.[7]

27.     <u>Refusal to Terminate Operating Under COA</u>.  On May 5, 2016, as a result of such disputes with BPC, WOG II formally exercised its right to take all of its gas in kind as permitted under the parties' contracts.

28.     On May 11, 2016, BPC wrongly refused to recognize WOG II's right to take its gas in kind, incorrectly claiming that WOG II was in default for failure to pay amounts invoiced under the improperly inflated JIBs (and therefore that WOG II could not exercise its right to take its gas in kind).

29.     On May 12, 2016, WOG II issued a Declaration of Event of Default under the Development Agreement and the COA to BPC.

---

[7] WOG II's calculation starts with the MCFs produced net to WOG II's interest found on the total page of the LOS. This number of MCFs is multiplied by the $.08 charge. The overbilled amount, which is not less than $760,197, is the difference between the Piceance Gas base invoice amount and the amount actually billed by BPC. See Schedule A.  BPC has refused to correct these improper charges.

30.     <u>Failure to Remit Required Payments to Monarch</u>.   On May 19, 2016, WOG II received a letter from Monarch, regarding the Monarch Agreement under which Monarch gathers and processes gas for BPC and WOG II. The letter was also addressed to BPC.  In that letter, Monarch informed WOG II that BPC had failed to make required payments to Monarch for gas gathering, processing and saltwater disposal (even though BPC has received and retained WOG II's share of the funds owed to Monarch). Monarch attached a Summary Account indicating that BPC had been short on monthly payments to Monarch beginning in Spring 2015, had stopped making payments altogether in September 2015, and as of May 19, 2016 owed not less than $1,325,762.54.

31.     BPC's failure to remit to Monarch the funds that are owed by WOG II to Monarch is a violation of its contractual and legal obligations to WOG II, and it directly and wrongly interferes with WOG II's contract with Monarch.

32.     On July 29, 2016, WOG II received notice from an attorney retained by BPC that he has filed mechanic's and materialmen's oil and gas liens under applicable Utah law on behalf of BPC against the ownership interests of certain WOG II properties.

33.     WOG II does not owe the amounts claimed by BPC, yet the liens placed by BPC adversely impact WOG II, including, but not limited to, clouding WOG II's title to its properties, improperly triggering bank loan covenants, and wrongly placing WOG II at risk of defaulting on its loan obligations.

34.     <u>Overbilling Schemes</u>.  Beyond the breaches listed above, BPC engaged in various overbilling schemes, including, but not limited to:

- <u>COPAS improperly billed for wells with no revenue</u>. Under the COA, the operator is entitled to overhead of $780 per month (plus cost of living

adjustment) per <u>producing</u> Well.  BPC overcharged at least $86,694 to WOG II for wells in months which there was <u>no</u> production.  *See* **<u>Schedule B</u>**.

- BPC charged WOC II for field employee time.  BPC cut the number of its field employees but failed to reduce the amounts charged for field employees.

- BPC uses the JIB Links system to report expenses.  WOG II has an amount not less than $44,035.75 in charges that it has disputed on that system that are unresolved, which include amounts billed for wells in which WOG II has no interest.

- Monarch meter charges improperly billed by BPC in an amount of at least $47,837. *See* **<u>Schedule C</u>**.

- BPC deducted Monarch gathering fees from revenue due to WOG II, but failed to remit to Monarch. This is an amount estimated to be at least $712,789.[8]

35.  <u>Summary</u>.  To summarize:[9]

| Item | | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|---|---|---|---|
| COPAS OH improperly billed | | | $ 11,311.65 | $ 15,170.96 | $ 27,679.47 | $ 22,923.67 | $ 7,197.41 | $ 2,410.88 | $ 86,694.04 |
| Wells with no revenue | | | | | | | | | Unknown |
| Field Employee's Time allocations | | | | | | | | | Unknown |
| Items previously disputed | | | $ - | $ - | $ - | $ 10,707.87 | $ 33,327.88 | $ - | $ 44,035.75 |
| Overbilled on Price Differential | | | $ 80,521.80 | $ 139,682.37 | $ 142,577.04 | $ 210,505.62 | $ 158,294.78 | $ 28,616.12 | $ 760,197.72 |
| Monarch Meter charges improperly billed | | | $ - | $ - | $ 24,632.40 | $ 11,378.36 | $ 11,826.87 | $ - | $ 47,837.63 |
| MVC's owed to Monarch | | | $ - | $ - | $ - | $ 200,543.51 | $ 682,207.26 | $ - | $ 882,750.76 |
| Gathering fees owed to Monarch | | | | | | | | | $ 712,789.77 |
| POP owed to Monarch | | | | | | | | | Unknown |
| Saltwater Disposal Dispute | | | | | | | | | Unknown |
| Total | | | $ 91,833.45 | $ 154,853.33 | $ 194,888.91 | $ 456,059.02 | $ 892,854.19 | $ 31,027.00 | $ 2,534,305.67 |

---

[8] Until WOG II obtains discovery, WOG II cannot be sure of the exact amount of these damages.  WOG II reserves its right to amend the amount of damages related to this breach.

[9] This chart is for illustration purposes only.  Until a proper accounting is made, and discovery is completed, WOG II is simply estimating certain of its damages and cannot estimate the amount of other types of damages.  Actual damages are likely higher.

36.    <u>Current Production</u>. In addition to the above amounts, BPC owes WOG II for proceeds received in 2017 in an amount of at least $44,615.03, which was improperly netted against WOG II's proportionate share of production proceeds for April 2017.  This relates to a "JIB JVEA Rebook" sent to WOG II on September 8, 2017.  In the "JIB JVEA Rebook," the Debtors netted certain disputed charges, some of which were for wells in which WOG II does not even own a working interest.  The Debtors have not provided to WOG II receipts or other evidence that these charges are proper.

**F.    Termination of COA**

37.    As of April 13, 2017 BPC had significant unpaid obligations including amounts due to mutual midstream providers. BPC had retained Parkman Whaling, an industry specialist in distressed debt situations. BPC was insolvent on both a going concern and a balance sheet basis as of April 13, 2017.  Article 7.1 of the COA provided that WOG II may terminate the COA upon the occurrence of certain events, such as at any time following BPC becoming insolvent.  On April 13, 2017, WOG II terminated the COA by sending a termination letter via e-mail and Federal Express to BPC. However, BPC wrongly refused to turnover operations and continues to operate the properties.

**G.    State Court Lawsuit**

38.    On September 6, 2016, WOG II filed State Court Complaint seeking damages and other relief in relation to BPC's breaches of its obligations.

39.    On October 14, 2016, BPC filed an answer to the State Court Complaint. WOG II attempted to obtain information but BPC refused to produce responsive documents. The state court lawsuit has been stayed due to BPC's bankruptcy.

**H.      WOG II's Interest in Production Proceeds, Liens, and Security Interests**

40.      Under the express terms of the JOA and COA, WOG II "own[s]" the production proceeds relating to its working interests, even though such funds may be held by BPC as operator.  Pursuant to Article III(B) of the JOA: "the parties shall also <u>own</u> all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter."[10]

41.      Furthermore, pursuant to Article V(D)(4):

Operator shall hold <u>for the account of the Non-Operators</u> any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and <u>such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied   to the payment of debts as provided in Article VII.B</u>."[11]

42.      Notably, under the COA, BPC is required to market production and pay expenses in accordance with the terms of the JOA.[12]

43.      Furthermore, pursuant to article VI(G) of the Joint Operating Agreement, WOG II has the right to take production in kind.[13]

44.      While BPC is not generally serving as a fiduciary under the JOA, it *does* have a fiduciary duty to properly collect and distribute Working Interest Funds:

Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose <u>other than to account for Non-Operator funds as herein specifically provided</u>.[14]

---

[10] Joint Operating Agreement at Art. III(B) (emphasis added).

[11] Joint Operating Agreement at Art. V(D)(4) (emphasis added).

[12] *See* Contract Operating Agreement at Arts. 4.6 ("Gasco will market such Hydrocarbon production in accordance with the terms of the Subject Operating Agreements…."); 4.13 ("Gasco shall pay and discharge such costs and expenses in accordance with the terms of the Subject Operating Agreements.").

[13] Joint Operating Agreement at Art. VI(G) ("Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area….").

[14] JOA at Art. V(D)(4).

45.     Pursuant to article VII(B) of the Joint Operating Agreement, BPC granted contractual liens and security interests to WOG II to secure BPC's obligations under the JOA:

> Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder.  Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.[15]

46.     BPC granted a similar contractual lien and security interest to WOG II pursuant to section 6.1 of the Contract Operating Agreement:

> In addition to any liens that may arise for the benefit of any Party hereto in connection with the Subject Operating Agreements, each Party grants to the other Party a lien upon any and all of its interests now owned or hereafter acquired in the Subject Interests owned by that Party in the Wapiti Contract Area and in lands pooled or unitized therewith, including its leasehold interests, working interests, operating rights and royalty and overriding royalty interests, and security interests in (i) its share of Hydrocarbons when extracted, (ii) its interest in all materials and equipment, and (iii) its accounts (including accounts arising from imbalances) to secure payment of all amounts to be paid by that Party hereunder in accordance with the provisions of this Agreement, together with interest thereon at the Agreed Rate. To the extent that a Party has a security interest under the Uniform Commercial Code of the State in which such Subject Interests are located (the "UCC"), upon default, that Party shall be entitled to exercise the rights and remedies of a secured party under the UCC. The bringing of a suit and the obtaining of a judgment by a Party for the secured indebtedness shall not be deemed an election of remedies or otherwise effect the lien rights or security

---

[15] Joint Operating Agreement at Art. VII(B) (emphasis added).

interest as security for the payment thereof In addition, upon default by any Party in the payment of any amounts to be paid by that Party pursuant to the terms hereof, <u>that Party shall have the right, without prejudice to other rights or remedies, to collect from the purchaser or purchasers of production proceeds from the sale of the defaulting Party's proportionate share of Hydrocarbons until the amount owed by the defaulting Party, plus interest at the Agreed Rate, has been paid</u>. Each purchaser shall be entitled to rely upon the written statement of the Party that is owed the funds concerning the amount of any default. If any Party does not perform all of its obligations hereunder, and the failure to perform subjects such Party to foreclosure or execution proceedings pursuant to the provisions of this Agreement, to the extent allowed by governing Law, the defaulting Party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available light to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable Law, each Party hereby grants to the other Party a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable Law or otherwise in a commercially reasonable manner and upon reasonable notice.[16]

47.     Pursuant to article VII(D)(5) of the JOA, WOG II is entitled to recover costs and attorneys' fees to enforce any financial obligation under the JOA, which costs and fees are secured by the contractual lien included in the JOA.[17]

**I.     Perfection of WOG II's Liens and Security Interests**

48.     WOG II recorded a memorandum of the JOA and COA in the real property records of each applicable county on May 21-23, 2012, including: Uintah County, Utah; Duchesne County, Utah; and Carbon County, Utah.[18]

49.     WOG II also filed financing statements against BPC with the Secretary of State of Delaware on June 26, 2013.[19]

---

[16] Contract Operating Agreement at § 6.1 (emphasis added).
[17] Joint Operating Agreement at Art. VII(D)(5) ("In the event any party is required to bring legal proceedings to enforce any financing obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.").
[18] *See* JOA Memorandums attached hereto as **Exhibit A**.
[19] *See* UCC Searches attached hereto as **Exhibit B**.

### J.     Orogen Loan and Assignment to Prepetition Lenders

50.     According to the Amended and Restated Credit Agreement, BPC borrowed money from Orogen Energy, Inc. ("Orogen") as agent for certain lenders under that certain Credit Agreement dated October 18, 2013, as amended (the "Orogen Credit Agreement").[20] This loan was made after WOG II recorded its liens and security interests.

51.     According to the Amended and Restated Credit Agreement, on August 19, 2014, Orogen subsequently assigned the loan to Garrison as administrative agent for the Prepetition Lenders.[21]

52.     According to GPC, on August 19, 2014, GPC and Garrison executed the Amended and Restated Credit Agreement.[22]  According to GPC, it has outstanding amounts due under the Amended and Restated Credit Agreement.[23]

53.     GPC alleges that the obligations owed under the Amended and Restated Credit Agreement are secured by perfected, first priority liens and security interests.[24]

### K.     The Bankruptcy Case

54.     On August 11, 2017 (i.e. the "Petition Date"), the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.  Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The bankruptcy cases are being jointly administered under Case No. 17-17465-KHT. No

---

[20] See Exhibit C (Amended and Restated Credit Agreement) of *Debtors' Motion for Expedited Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Authorizing the Debtors to Use Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Dkt. No. 16] (the "DIP Financing Motion"), Case No. 17-17456-KHT (Bankr. D. Col. Aug. 14, 2017) at "Whereas" clause 1.
[21] *Id.* at "Whereas" clause 2.
[22] DIP Financing Motion at ¶ 9(d).
[23] DIP Financing Motion at ¶ 14.
[24] DIP Financing Motion at ¶¶ 15-16.

request for the appointment of a trustee or examiner has been made in the Debtors' cases, and no committees have been appointed or designated as of the date of this filing.

55.     On August 14, 2017, the Debtors filed the DIP Financing Motion.

## VI.
## CAUSES OF ACTION

### A.     Breach of Contract #1 – Improper Joint Interest Billing

56.     All prior paragraphs are incorporated fully herein as if restated verbatim.

57.     BPC has failed to complete all accounting and bookkeeping functions required of an operator under applicable agreements, including collection of revenues, preparation and timely transmittal of JIBs, and all other auditing, accounting and bookkeeping services generally required for the proper management of the Subject Interests and rendering of the Operator Services under the COA.

58.     BPC has improperly invoiced WOG II through the JIBs, and has improperly deducted from funds owed to WOG II for amounts that WOG II does not owe.

59.     BPC has been untimely in delivering the JIBs to WOG II.

60.     BPC's breaches have been the proximate cause of direct financial harm to WOG II, and WOG II is entitled to recover all available damages from BPC proximately caused by those breaches.

### B.     Breach of Contract #2 – Failure to Provide WOG II its Gas In Kind Upon Request

61.     All prior paragraphs are incorporated fully herein as if restated verbatim.

62.     On May 5, 2016, pursuant to its rights under Art. VI(G) of the Joint Operating Agreement and under the COA, WOG II notified BPC that as of June 1, 2016, WOG II would exercise its right to take its share of gas production in kind.

63.     BPC has refused to recognize WOG II's election, erroneously claiming WOG II is in default and that such default prevents WOG II from exercising its rights.

64.     BPC's refusal is a breach of the parties' agreements.

65.     BPC's breach has been the proximate cause of harm to WOG II, and WOG II is entitled to recover all available damages from WOG II proximately caused by those breaches and to obtain specific performance of its right to take gas in kind.

**C.      Breach of Contract #3 – Improper Production Differential Charges**

66.     All prior paragraphs are incorporated fully herein as if restated verbatim.

67.     Section 3.5 of the Development Agreement permits BPC to charge WOG II for its share of actual third-party marketing fees and expenses paid to Piceance, and requires BPC to pay to WOG II one-half of all payments actually received by BPC from third-parties on account of BPC marketing such third-parties' production in the Contract Area (less royalty, overriding royalty and any other payments made by BPC on account of such third-party production). BPC has not charged WOG II for actual third-party fees and expenses, and BPC has failed to pay WOG II its share of marketing revenues.

68.     BPC has wrongly charged WOG II for so-called "Production Differential" charges, in violation of the Development Agreement.

69.     BPC's breaches have been the proximate cause of harm to WOG II, and WOG II is entitled to recover all available damages from BPC proximately caused by those breaches.

**D.      Breach of Contract #4 – Breach of the Closing Agreement, the COA and the Joint Operating Agreement**

70.     All prior paragraphs are incorporated fully herein as if restated verbatim.

71.     BPC failed to pay monies owed to third parties on WOG II's behalf.

72.     BPC improperly collected money from WOG II designated for payment to Monarch and then failed to use those funds toward the Monarch bills.

73.     BPC has failed to pay more than $882,750 owed to Monarch under the Monarch Agreement associated with the failure to deliver Quarterly Minimum Volumes, for which BPC agreed under the Closing Agreement to be exclusively liable (and to hold WOG II harmless from such obligations).  *See* **Schedule D**.

74.     BPC's breaches have proximately caused harm to WOG II, and WOG II is entitled to recover all available damages from BPC proximately caused by those breaches.

### E.     Money Had and Received

75.     All prior paragraphs are incorporated fully herein as if restated verbatim.

76.     WOG II owns working interests in certain oil, gas and mineral leases and wells operated by BPC.

77.     BPC has retained Production Proceeds and Expense Funds from those working interests that in equity, justice, law and good conscience belong to WOG II.

78.     BPC has improperly retained Expense Funds paid by WOG II for expenses that BPC is required to pay to third parties.

79.     WOG II has and continues to be harmed by BPC's retention of such Working Interest Funds.

80.     Therefore, WOG II is entitled to a judgment against BPC for all of the Working Interest Funds improperly held by BPC.

### F.     Declaratory Judgment – WOG II Properly Terminated the Contract Operating Agreement Prior to the Petition Date

81.     All prior paragraphs are incorporated fully herein as if restated verbatim.

82.     As of April 13, 2017 BPC had significant unpaid obligations including amounts due to mutual midstream providers.  BPC had retained Parkman Whaling, an industry specialist in distressed debt situations. BPC was insolvent on both a going concern and a balance sheet basis as of April 13, 2017.

83.     Article 7.1 of the COA provided that WOG II may terminate the COA upon the occurrence of certain events, such as at any time following Gasco becoming insolvent.

84.     On April 13, 2017, WOG II terminated the COA by sending a termination letter via e-mail and Federal Express to BPC.

85.     BPC wrongly refused to turnover operations and continues to operate the properties.

86.     WOG II requests the court issue an order declaring the COA was properly terminated and order BPC to turnover operations in the Contract Area (Riverbend) to WOG II.

**G.     Declaratory Judgment – WOG II's Liens and Security Interests are Valid and Enforceable**

87.     All prior paragraphs are incorporated fully herein as if restated verbatim.

88.     BPC granted WOG II a contractual lien and security interest to secure obligations owed under the JOA and COA.  JOA at Art. VII(B); COA at Art. 6.1.

89.     Such liens and security interests attach to the real and personal property located in the Contract Area, as well as the proceeds related thereto.  *Id.*

90.     Accordingly, WOG II is entitled to a declaratory judgment determining that (i) BPC granted WOG II a contractual lien and security interest to secure obligations owed under the JOA and COA, (ii) such liens and security interests attach to the real and personal property located in the Contract Area, as well as the proceeds related thereto, and (iii) the JOA and COA liens and security interests are valid and enforceable.

**H.** **Declaratory Judgment – WOG II's Liens and Security Interests are Senior in Priority to Garrison's Liens and Security Interests**

91.     All prior paragraphs are incorporated fully herein as if restated verbatim.

92.     WOG II properly recorded its liens and security interests by filing them in the applicable real property records and with the secretary of state of Delaware.

93.     WOG II recorded its liens and security interests prior to Garrison and/or Garrison's predecessor(s) in interest recording its respective liens and security interests.

94.     Accordingly, WOG II is entitled to a declaratory judgment determining that (i) WOG II's liens and security interests are properly perfected and (ii) WOG II's liens and security interests are senior in priority to Garrison's liens and security interests.

**I.** **Conversion**

95.     All prior paragraphs are incorporated fully herein as if restated verbatim.

96.     WOG II owns working interests in certain oil, gas and mineral leases and wells operated by BPC.

97.     WOG II is entitled to its proportionate share of production and/or the Production Proceeds related to its working interests.

98.     BPC holds Expense Funds owned by WOG II for WOG II's benefit.

99.     BPC has wrongfully exercised control over these Working Interest Funds in a manner that is inconsistent with and in clear repudiation of WOG II's legal and contractual rights.

100.    WOG II has demanded its proportionate share of the production and/or the Production Proceeds related thereto, but BPC refuses to provide it to WOG II.

101.   BPC's conversion of the Working Interest Funds has proximately caused harm to WOG II, and WOG II is entitled to recover all available damages from BPC proximately caused by such conversion.

**J.    Constructive Trust**

102.   All prior paragraphs are incorporated fully herein as if restated verbatim.

103.   Based on the course of dealing between BPC and WOG II, as well as the JOA and COA provisions requiring BPC to hold funds in trust for WOG II, a special relationship of confidence and/or trust arose and existed.  *See, e.g.,* JOA at Art. V(D)(4) ("Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose <u>other than to account for Non-Operator funds as herein specifically provided</u>.") (emphasis added).

104.   BPC held Production Proceeds and WOG II's proportionate share of Expense Funds in trust; while BPC has or had possession of such funds, BPC at most has bare legal title to such funds, while WOG II has equitable title in the funds.

105.   BPC misused the Working Interest Funds it held in trust for WOG II's benefit by among other things, wrongly invoicing WOG II for "Production Differential" fees and failing to make the required payments to Monarch for gas gathering, processing, and saltwater disposal (even though BPC has received and retained WOG II's share of the funds owed to Monarch).

106.   BPC is improperly and inequitably holding WOG II's Working Interest Funds, and is unjustly benefiting from such funds.  Such inequitable conduct or unjust enrichment warrants imposing a constructive trust over such funds.

107.   WOG II can trace its respective Working Interest Funds through joint interest billing statements and other documents, which acknowledge and evidence WOG II's working interests and the proportionate share of Production Proceeds and Expense Funds related thereto.

108.    BPC's willful and intentional misuse of the Working Interest Funds has proximately caused harm to WOG II, and WOG II is entitled to recover all available damages from BPC proximately caused by its misuse, as well as a constructive trust over the Working Interest Funds.

**K.    Resulting Trust**

109.    All prior paragraphs are incorporated fully herein as if restated verbatim.

110.    BPC held Production Proceeds and WOG II's proportionate share of Expense Funds in trust; while BPC has or had possession of such funds, BPC at most has bare legal title to such funds, while WOG II has equitable title in the funds.

111.    The parties intended that WOG II own the Working Interest Funds, that the funds be held only for WOG II's benefit, and that WOG II retain equitable title in the funds.  *See* JOA at Arts. III(B), V(D)(4); COA at Arts. 4.6, 4.13.

112.    Accordingly, WOG II is entitled to the imposition, in its favor, of a resulting trust upon the Working Interest Funds, and to judgment imposing such a resulting trust and ordering the delivery of such funds.

**L.    Declaratory Judgment – The Proceeds of WOG II's Working Interests are Not Property of the Bankruptcy Estate under section 541 of the Bankruptcy Code**

113.    All prior paragraphs are incorporated fully herein as if restated verbatim.

114.    BPC has, at most, bare legal title to the proportionate share of production proceeds related to WOG II's working interests, while WOG II has had, at all times, equitable title.

115.    As described above, BPC has improperly overbilled WOG II and improperly net such amounts against WOG II's proportionate share of production proceeds.  BPC continues to

overbill and improperly net against WOG II's proportionate share of production proceeds (collectively, the "Overbilled and Improperly Net Amounts").

116.    Therefore, WOG II is entitled to a declaratory judgment determining that (i) WOG II holds equitable title to the Overbilled and Improperly Net Amounts and held equitable title to the Overbilled and Improperly Net Amounts as of the Petition Date, (ii) BPC has, and as of the Petition Date had, at most, bare legal title in such funds, and (iii) such funds are not property of BPC's estate.

**M.    Accounting**

117.    All prior paragraphs are incorporated fully herein as if restated verbatim.

118.    BPC owed a contractual obligation to provide WOG II a full and accurate account of all statements, allocations, measurements, computations, charges, and payments made under the JOA and COA.  JOA at Exhibit C, Art. I(5) (right to audit).

119.    BPC failed to comply with its contractual obligations to provide WOG II with a full and accurate account of all statements, allocations, measurements, computations, charges, and payments made under the JOA and COA.

120.    WOG II seeks and is entitled to a full and accurate accounting from BPC, including an itemized accounting of how much Working Interest Funds attributable to WOG II's working interests are being held by BPC, the specific fees and charges towards which BPC applied any such funds, and a full, accurate and itemized accounting of all statements, allocations, measurements, computations, charges and payments BPC has made pursuant to the JOA and COA.

**N.    Turnover of Property**

121.    All prior paragraphs are incorporated fully herein as if restated verbatim.

122.    BPC has possession of Working Interest Funds that belong to WOG II and that are not property of BPC's estate.  Accordingly, WOG II is entitled to immediate receipt and possession of the Working Interest Funds.

123.    BPC is not entitled to the Working Interest Funds it holds for WOG II's benefit and is not entitled to withhold such funds from WOG II.

124.    BPC has failed to turnover the Working Interest Funds to WOG II.

125.    BPC's failure to turnover the Working Interest Funds has proximately caused harm to WOG II, and WOG II is entitled to recover all available damages from BPC proximately caused by such failure to turnover the funds.

126.    WOG II is entitled to an immediate turnover of the Working Interest Funds held by BPC.

**O.    Segregation of Working Interest Production Proceeds Into Escrow and 25% Penalties – Utah Code § 40-6-9**

127.    All prior paragraphs are incorporated fully herein as if restated verbatim.

128.    BPC is holding proceeds derived from the sale of production from wells producing oil and/or gas in Utah.

129.    WOG II is legally and contractually entitled to the payment of its proportionate such proceeds pursuant to its working interests.

130.    BPC has failed to pay WOG II's proportionate share of the Production Proceeds, and such failure to pay has lasted more than 30 days after the calendar month within which payment was received by BPC for the Production Proceeds.

131.    BPC has not deposited such proceeds into an escrow account in a federally insured bank or savings and loan institution using a standard escrow document form.

132.    Accordingly, WOG II is entitled to (i) a complete accounting, (ii) interest at a rate of 1-1/2% per month, and (iii) a penalty against BPC of 25% of the total proceeds and interest.

**P.    Punitive and/or Exemplary Damages**

133.    All prior paragraphs are incorporated fully herein as if restated verbatim.

134.    BPC acted maliciously and intentionally and/or was grossly negligent in misusing the Working Interest Funds, committing fraud, breaching its fiduciary duty to manage the Working Interest Funds for WOG II's benefit, converting the Working Interest Funds for its own benefit, and/or tortuously interfering with WOG II's contract with Monarch.

135.    Therefore, BPC is entitled to a judgment awarding punitive and/or exemplary damages against BPC in an amount equal to no less than three times the amount of damages that WOG II has and continues to suffer in this matter.

## VII.
## COSTS AND ATTORNEYS' FEES

136.    All prior paragraphs are incorporated fully herein as if restated verbatim.

137.    WOG II has found it necessary to employ attorneys to enforce its rights under the agreements.

138.    WOG II is entitled to recover its reasonable and necessary attorneys' fees and expenses as permitted at law, in particular under Chapter 38 of the Tex. Civ. Prac. & Rem. Code. Moreover, the parties contractually agreed the prevailing party in any action to enforce its rights under their agreements shall be entitled to the recovery of attorneys' fees, court costs, and costs of collection. *See* JOA, Art. VII(D)(5); Development Agreement § 9.5.

## VIII.
## CONDITIONS PRECEDENT

139.    WOG II submits that all conditions precedent to its right to file suit and its rights of recovery herein have occurred.

## IX.
## PRAYER

For the reasons stated above, WOG II prays that following a trial on the merits, the Court enter a final judgment:

1.     Determining the amount of actual damages to WOG II;

2.     Awarding punitive and/or exemplary damages to WOG II;

3.     Segregation of any Working Interest Funds in an escrow account in a federally insured bank or savings and loan institution;

4.     Ordering that WOG II is entitled to take production in kind;

5.     Interest on the Working Interest Funds improperly held by BPC;

6.     A 25% penalty against BPC;

7.     Declaratory judgments that (i) BPC granted WOG II a contractual lien and security interest to secure obligations owed under the JOA and COA; (ii) such liens and security interests attach to the real and personal property located in the Contract Area, as well as the proceeds related thereto; (iii) the JOA and COA liens and security interests are valid and enforceable; (iv) WOG II's liens and security interests are properly perfected; (v) WOG II's liens and security interests are senior in priority to Garrison's liens and security interests; (vi) WOG II holds equitable title to the Overbilled and Improperly Net Amounts and held equitable title to such funds as of the Petition Date; (vii) BPC has, and as of the Petition Date had, at most, bare legal title in such funds, and (viii) such funds are not property of BPC's estate; and (ix) WOG II properly terminated the COA prior to the Petition Date;

8.     An accounting;

9.      A constructive trust over the Working Interest Funds;

10.     A resulting trust over the Working Interest Funds;

11.     Turnover of the Working Interest Funds;

12.     Reasonable and necessary attorneys' fees, court costs, costs of collection, pre- and

        post-judgment interest as allowed by law; and

13.     All other and further relief to which WOG II may show itself to be entitled.

DATED: September 18, 2017.                          Respectfully submitted,

                                    **THOMPSON & KNIGHT LLP**


                                    By:___/s/ Steven J. Levitt_____
                                    Mitchell E. Ayer
                                    Texas State Bar No. 01465500
                                    811 Main St., Suite 2500
                                    Houston, Texas 77002
                                    Telephone: 713.654.8111
                                    Facsimile: 713.654.1871
                                    E-mail:  mitchell.ayer@tklaw.com

                                    Steven J. Levitt
                                    Texas State Bar No. 24092690
                                    One Arts Plaza
                                    1722 Routh Street, Suite 1500
                                    Dallas, TX 75201
                                    Telephone: 214.969.1700
                                    Facsimile: 214.969.1751
                                    E-mail: steven.levitt@tklaw.com

                                    **ATTORNEYS FOR WAPITI OIL & GAS II LLC**